This court's decision did Edwards and Tanefly make clear that the court has the authority to consider Step 1. In fact, in Fenton, that's precisely what the court did. The case was litigated as a Step 2 case, and what this court said was... The case was litigated as an Establishment Clause case. Well, it was litigated as both, Your Honor. The district made a 7-page argument on Pickering saying it has the authority to control Borden's actions, and so any rights that he might have are trumped by the district's interests. The district claimed more interests than just the Establishment Clause, and even Borden conceded that because he conceded at least that the district had a claim to an additional interest, alluding litigation over the Establishment Clause. Over the Establishment Clause? Yes, Your Honor. But a lot of the grounds, which seem to me to be pretty forceful grounds to support the school district's actions, were not really postured before the district court in the same context. Were they to justify the balancing, the picking-balancing? Yes, Your Honor. Yes, Your Honor. They were. Advocating a picking balance? Yes, Your Honor. Page 44 to 50 of the cross-response on summary judgment below includes the Pickering argument. Page 44 to 50? That's pretty far back in the argument, isn't it? It's a cross-response. Well, I suppose, Your Honor. It's certainly not something that could be overlooked. Your argument in your summary judgment, I've read your summary judgment, it was almost 100% Establishment Clause stuff. The only Pickering argument in that, in those briefs, was not with reference to any discussion that Gordon does not have rights. The whole point of your Pickering discussion was that Gordon does have rights and the principle announced in Pickering would allow the district to curtail those rights. Correct? Whatever rights he has, and I believe the language was almost precisely this in the brief, whatever rights he has or might have, the school district's interest to trump those rights. And the only thing where you really dealt with there was coercion as opposed to, you didn't talk about, well, the number of things you're saying now you have a right to control. The correction, the things like that, whatever rights. Actually, Your Honor, first of all, it was not just arguments about coercion below. The district specifically said that the case should be evaluated insofar as it was done as an Establishment Clause should be evaluated under the Lemon Test, the Coercion Test, and the Endorsement Test, and the district wins all three. That's true in the opening brief and in the cross-response. Establishment Clause. Yes, Your Honor. That's what we're here for, isn't it? Yes, Your Honor, but there's something about that, which is that it doesn't, while we think that Warden's conduct is a clear Establishment Clause violation and that's enough, it is also the case that the district doesn't have to show a clear Establishment Clause violation because the district has to be allowed some leeway to make reasonable judgments, even with respect to the Establishment Clause, to avoid being sued, to avoid the problems arising that the Establishment Clause is supposed to deal with. And the district clearly said, in addition to saying we're limited by the Establishment Clause, it also clearly said below, we're trying to protect the rights of the kids. This is about the kids. What rights, though? The rights to be protected from the establishment of leeway by the school? Well, a couple of things, Your Honor. One is certainly that. Another is the parental rights because, after all, it was parents who complained. And they're all religion-related, Your Honor, and because we think that his conduct is an Establishment Clause violation, certainly that's enough to dispose of the case that way. And whether that's on purpose or effect, it's not. You're losing me here. Let me ask you directly. How do you want to win this case? If you could write the opinion to allow you to win this case, how would you write it? Your Honor, we can win it in lots of ways. The easiest way, and therefore probably the one that's the most convenient for the court, is simply to say she doesn't have any rights. As we said in Edwards, as this court rather said in Edwards, that's a threshold question that this court can consider and therefore doesn't need to get into any more complicated analysis. Even though you didn't raise any other rights below? Excuse me, Your Honor?  No, Your Honor. What we argued was pickering steps with any right that he might have. Going along what you just answered, you would argue that the policy and the directive that you put in place is not overly broad, it's not vague, it's something you had the right to adopt, it wasn't public speech, and it meets the pickering test, and therefore we should reverse what the district court did. Is that correct? Absolutely, Your Honor. But if the court is worried about pickering step one, and I don't think it should be because of kind of flying Edwards, then it can certainly make that same decision under step two because all that's necessary at that stage is for the district to show that its policy or its policy directive is reasonably related to a legitimate interest. Okay. And we clearly raised legitimate interest. Okay. Well, I asked you which way you wanted to decide this and you answered that. So we now have the policy in place. Yes, Your Honor. And the policy was promulgated October 20th, which every year, 2005. 2005, yes. Borden goes to court to seek the declaratory judgment, the injunction, and he challenges it. As you reminded him in court that you weren't suing him, he challenged he who's asking for a declaration of some sort. Yes, Your Honor. Okay. Could you tell me on your policy? Because really what he asked for, and Judge Kavanaugh simplified it somewhat when he was looking at some of the judgment. He said you're asking for the right to bow your head and you're asking for the right to kneel. Yes, Your Honor. Okay. How does your policy prohibit him from bowing his head or taking a knee? Well, Your Honor, what the policy does is it presents a couple of things. Show me which section says he can't bow his head. I want to answer that, too, as Your Honor. First of all, what the policy language says is that he can't participate in student prayer, and then it quotes the language from Bill against Duck and Bill. But also, in Borden's statement of undisputed facts, he says the district made clear to him that if he bows or kneels for prayer when the students are praying, he has been insubordinate. He says that in his statement of undisputed facts, Your Honor. He clearly understood it. I'm going to assume that you answered the question, then. Yeah. See, the reason for my question is I read your policy, and procedurally this case is difficult. But yet it could be very simple. I look at your policy and I say, where do you say that Borden can't bow his head? And I don't think that bowing his head is encouragement. You might be able to make some argument that it somehow could be lead, but I'm not sure that it's lead. And I don't see how either bowing your head or taking the knee constitutes participation. Well, a couple of things about that. What would your argument be to those two statements? All right. I will first say something specifically under the policy and then say something more broadly, if I might. Specifically under the policy, the policy says, among other things, no participation. Then it goes on and explains that the Fifth Circuit says things like joining hands with the students in a prayer circle or otherwise showing approval of or solidarity with the students during prayer is a violation. Active participation in that case. Active participation. Well, actually, I think that the term active participation is an oxymoron. Participation is participation. But more than that, what Borden does here is incredibly active. And let me say just one thing about that. What happens in the locker room, and this is undisputed in the record, is that Borden stands in front of the team. They're all kneeling to him. He's at the board giving them instructions. He then stops. He gets down on his own knee for one and only one thing, and that's the prayer. That was before. Not now. Not now. It is now, Your Honor. In 2006, he now gets down on his knees at the outset, and he gives them strategic and tactical. They discuss that kind of stuff on his knee, and then they go into the prayer. With respect, Your Honor, that's not the record. The record is that he gives them the instruction and then gets on his knees for the prayer. Where is that? That was prior to 2016. It's what he's claiming to do, Your Honor. It's when he says, what I want to do is when the kids bow or kneel for prayer, I want to do that too. He doesn't say, I want to see you bow and kneel. Bow and kneel. Yes, Your Honor. It's not kneeling. Let's get to one thing straight here. We are not talking about a case of kneeling, and we're not talking about a case of genuflecting. We're talking about taking a knee. Now, until last Sunday when the Mets lost, that was a great baseball thing. But I even knew then, before then, what taking a knee is in football, and it is neither kneeling nor genuflecting. Except that, Your Honor, the team is taking a knee through the entire instruction. He talks about the coach kneeling and genuflecting. He's doing neither. He's taking a knee with his team. Whether that's right or wrong is another question. But that's what he's doing. He's taking a knee, Your Honor, which we can do the same as genuflecting, but that's neither here nor there. The real point, but that's not the test. The real point is whether he's at, the real point is number one, whether his actions violate the policy, and number two, whether his actions violate, or number two, whether his actions violate the establishment clause. Exactly so. We talked about pickering. Given Garcetti, does pickering, do we get to pickering under Garcetti? Well, Your Honor, the way that we read Garcetti, Garcetti is the most recent statement of the way that the pickering test works. Depending on the way one looks at it, it either clarifies or restates it. Well, if there's all the official duties, why would you need the pickering balance? If someone is within the confines of official duties and acting pursuant to those duties, under Garcetti, you don't need to balance anything because there's no First Amendment protection in that context, is there? That's correct, Your Honor, but that's still considered part of the overall pickering test. The Supreme Court made that clear in Connick, for instance. It's a two-part inquiry. It's a two-part inquiry to resolve a First Amendment claim. Unless you get past Garcetti, if the answer to that first question, whether or not the person is involved in the professional duties, is yes, then there is no First Amendment claim. The Court talked about the answer is no. That does rise to the First Amendment claim, which is then resolved if it's the pickering balance. Correct, Your Honor. It's only if the employee survives at that first stage that there's even a First Amendment interest potentially implicated. But there's no Garcetti from the district court. No, Your Honor. We made the argument about the balancing test. There's no waiver rule that applies to case citations. And Garcetti really was just the most recent in the stream from pickering to Connick through several Supreme Court cases and all the other authority, of which other cases like the Supreme Court's decision in the city of San Diego and others were all included in our briefing below. So the fact that Garcetti itself wasn't mentioned doesn't change things because the two-step analysis had been clear for a long time. And the argument was clearly made that whatever rights he might have, he loses. We think because it's a threshold question, the Court doesn't need to get that far. But if it does, looking at that stage is over, too. This has no relation to anything that happened before the district court in this whole discussion. There's no relation to anything that went on beyond Judge Kavanaugh. And, indeed, you faulted him in your brief in his failure to ask the right question as to an issue which wasn't raised. This was an establishment clause case. This is the way it was litigated below. Now, let me ask you one question. Yes, Your Honor. I want to know what you believe Judge Kavanaugh did. You seem to say that he swept down in its entirety and forever barred the district's policy, forbidding teachers to meet or participate in student fairs. I think your friends across the aisle seem to agree because they say he found the policy overbroad and vague. Yes, Your Honor. But I wonder. I don't think he swept down the policy or the district's enforcement of its directives. It appears to me, and tell me what you think, he barred the district from enforcing its directives in the 2006 season in such a manner as to prohibit the conduct in which board members wish to engage. That's all he did. Your policy is there, and under the policy, the district cannot tell him and bow his head and take a knee. Well, two things about that, Your Honor. Am I right or wrong? I think that's incorrect, Your Honor, and I think that's incorrect for this reason. When the court was doing what you made reference to in the 2006 season, it was really saying, this is perspective. And the district court met a court of law in refusing to consider anything that happened in the past. He did that expressly in page 9 of the Jordan appendix. But I understand that. But what went on at what he was saying when he was talking about the 2006 season, when he goes through to a ruling in the last 10 pages or so of the transcript, he's speaking generally except for those sort of first words where he's saying essentially board members talking about the future, not the past. And his ruling strikes down the policy, says you can't enforce that. We think that that's fair and more. If not, the policy is in effect right now, and the ruling is violating it. This really is like the cheshire cat. We're talking about a policy which is aimed at fair. We're talking about a litigant who claims, and the district court accepted this, that he's not lying. He's taking a knee as it were in a certain context with the district court. He's looked at for reasons I don't quite understand. He's bowing his head or lowering his head. He's bowing to a word of the word. The law is taking a knee at a time when his team is taking a knee. In the cause, he talks about appropriateness, so he talks about prayer. Two things about that, John. The first is that it doesn't matter, even if he's not actually praying, the questions are whether is he endorsing prayer? Is he showing approval for prayer? Is he participating in prayer? And whether he's saying the words or not are not necessary. The Supreme Court indeed made clear that standing up for prayer, even if you don't agree with it, can be participation. And so that's what we're talking about. And beyond that, Your Honor, it's important to keep the history in mind. For 23 years, Borden was leading and sponsoring and directing the student prayer. And what he's asking us to do now is to say it was a brand-new day when I filed my complaint because I'm saying I'm going to do something else, when really he's doing virtually the same thing. What do you do with the way this case was handled by the district at the district court? What do you do with Superintendent Magistro's testimony? For example, if the courts determine that Borden's taking a knee, bowing his head is appropriate, that's fine. He can do that. That's what this case is all about. And then she says, if the courts come down and say Mr. Borden can bow his head, bend his knee, jump on the table, I am going to allow that. What do you do with that? That's the way the case was handled below. So you really have, in effect, a consent judgment. He wanted to do these two things, and she said, fine with us. Well, that's what it looks like. It looks like a mess to me. And then a new counsel comes in on the field. And we're on a whole new ballgame. No, Your Honor. The school board never thought that what she was doing was appropriate. It was gang-stealing. It was gang-stealing. It was gang-stealing, why? Because it was either a period to the reasonable observance of your prayer or because of one prayer and he admitted it. A couple of things, Your Honor. What's appropriate is not what I was saying. What he was going to do, she said, was fine with the district. She would allow it. We're not talking conceitedly what he did in the past. Let's just say it was verbal. We're talking about what she said, the two things that were proposed would be perfectly fine. Actually, what I believe she was saying there, Your Honor, is that if the court rules that he has the rights, then he has the rights. Because this is a confused, difficult area of the law. And I think the people in the district were people of goodwill trying to work this out. And the court gave the imprimatur to what he was permitted to do. And now you're saying, uh-uh, won't work. It's not supposed to be the district court's job to do that. It's supposed to be the school district's job. This is why we need policies is because, frankly, look, this can be a complex area of the law. Context always matters. The Supreme Court has said so. And rather than leaving the teachers at sea, what the school district did was impose a policy that said, here's what it's going to be. And then, yeah, the district court said if the superintendent and the district court strikes down the policy, then he might have to let you do more. Really, the district court really did this. He said he can do those two things. Show me what he did. The two silent gestures, let's put it that way, as opposed to actively participating in prayer. Well, Your Honor, we think that is active participation. And active participation isn't the only thing that's a violation. Showing approval for the prayer, endorsing the prayer, coercing even subtly the kids to think that they ought to participate in the prayer if they want to play football, all those things are also constitutional violations and violations of the policy. What do you think you have? How are you going to enforce this? For example, he can bow his head, you said, at the district court. But your reply to the district court said there can't be a pronounced bowing of the head. Who's going to walk around with a ruler? And I'm not being facetious. I understand, Your Honor. Or he has his head bowed, but he says he's not praying. Well, is he or isn't he? Who knows? I mean, he's not saying words, but there can be silent prayer. Who's going to enforce this? Well, again, Your Honor, as an establishment clause matter, it can be complicated at the margins. There's no question about that. But the enforcement comes when the school district uses words that every teacher understands and says, don't participate in student prayer. And then the test is, because this is an employee policy, the test is only is that, you know, clear enough that somebody might understand that he might get into trouble. How can he constitutionally respond to constitutionally initiated student prayer in your judgment? A number of ways, Your Honor. He can stand by there while it goes on. Now, of course, again, the context matters, and so the history matters. He can quietly and respectfully walk out of the room. He can continue what he was doing. He can wave respectfully while the kids do it, but not show a sign that physically associates himself, like, getting down on his knee with what the kids are doing. Or he closes his eyes while he's standing. Your Honor, I think that the context matters, though, and it's not possible to give an abstract answer. I think that's probably okay. What if a new coach comes in without the history, and a new coach decides he's going to bow his head for grace and take a knee while they say a prayer? Well, to be sensitive. Is that all right if someone without the history does it? Maybe, Your Honor, but it depends on how a reasonable observer would view it. And so, again, the context matters. Where is he standing? Does he put himself in the middle of the students when he does that? Who's going to make those judgments? Who's going to judge them? Well, in the first instance, the school board can do it, because it gets to institute its policy and say, this isn't how we work right around at school. So they have somebody following him around to measure the pronouncement of the bow, to make sure that only one knee hits the ground as opposed to two? No, Your Honor, they make a policy, and we expect that their employees will follow it. And the policy is far more clear than what's normally required for an employment policy. And at the point that he disobeys, if he chooses to disobey, then the school district gets to decide what action to take. Do you think that for the 2006 season, when he was bowing his head and taking a knee, he was being insubordinate? That's a yes or no. It is, Your Honor. The answer would be yes, but for the fact that the district court ruling interposes itself between the judgment and between the policy, rather, and his actions. But for the district court's judgment, no question about that. There was no question at all. Even though your people said that it would be permissible for him to do those things if the court said he could do it? Yes, Your Honor, and what I'm saying is completely consistent with that. I'm saying that the district court's judgment stops the enforcement of policy, meaning that it would be inappropriate to treat him as insubordinate for violating a policy that the district court had said is unenforceable. So if he bows his head, even though he certainly is not praying, and he takes a knee with his team to discuss tactics and strategy, and the student initiates a prayer at the end of it, he is insubordinate and can be punished. In this case and on this record, absolutely, Your Honor. The 23-year history, his history of showing that he would do what it takes to keep the practice in place, what the kids know about this, how he's behaving in this particular context, all those things go together to make that a clear yes, Your Honor. The team is praying. When they're doing the knee thing in the bottom, they're not saying that they're just having a moment of solemnize in the game or a contemplative moment or whatever. Somebody encouraged whatever. Does the team is praying when they're in the locker room? Yes, Your Honor. There's no question about that. There's no question that Gordon was leading the prayer before, and there's no question that it is prayer now. One student leads the prayer while the others are on their knees. That's absolutely clear in the record. It's not a case that it's a moment of silence or anything else. It is absolutely prayer. And they have a right to do that. The students have a right to do that. Yes, Your Honor, assuming that it is truly student-initiated and student-led. If it's not student-initiated, then no, but otherwise, yes, the school district has never said otherwise. In fact, the policy specifically says students have the right to pray. They can pray when and where and how they want to. The issue is what faculty can do. The issue is what the district can do. Is it student-initiated? No, Your Honor. But it is now as of 2006. Well, Your Honor, in 2006, that was when Gordon ordered the team captains to take a vote. The team captains take a vote at Mr. Riccioselli's request. Yes, Your Honor. You have turned that into manipulating the team in your group. No, Your Honor. That's the word, manipulating. But, Your Honor, the Supreme Court said that when the government, and here Gordon is the representative of the government because he's the one working with the kids as the coach, the figurehead for the government. When the government puts the question of prayer in a public school setting to a majority vote, that's a violation. That was a case of controversy. I've asked a lot of questions. I've stayed away from that particular question so far. But that was what that was all about. If they weren't going to pray, if the students didn't want to pray during the 2006 season, there was no case of controversy to go forward. Well, Your Honor, the knowledge is imputed to the reasonable student observer of his history and of the fact that he's suing the district in order to continue the practice. And then he might say, whatever you want to do is fine with me, but he also says, I need to know this for my case. And he's the coach. The coach is the coach. The coach is the boss. The student is the other captain. Excuse me. Garcia and Nixon, I believe. Do you know what they said to the players that they called? No. What we know is what was in the e-mail sent back to the coach, which says, sorry it took us so long to do this. We know you wanted it. Everybody wants to continue our prayer ritual. And I take it the same thing is happening in 2007. Yes, Your Honor.  and Borden is continuing his practices, in just the same way that he did last year. Just to clarify the exception of all this, the school district would not have adopted a policy at all, at least on the facts in front of them in 2005, unless they were concerned about litigation against them for violating the establishment clause. Well, not only that, Your Honor. Yes, Your Honor. That's a yes to that one. Yes, but not only that. That wasn't the only concern that the district voiced. That was a concern that led to the policy, and that's clear. The other concerns were, even before the first parent threatened to sue, when a parent complained, the district thought, you know, this is a problem. The kids are being cursed. Correct, Your Honor. And it can complicate the case. Okay. The answer is that is certainly enough for us to win on, and yes, that was absolutely a concern. Well, your red light is on Ben. I think he deserves another hour or two for rebuttal. The court wants me to continue? I didn't say that. I said he deserves the time for rebuttal. Thank you. Thank you. Thank you. Good afternoon, Your Honor. My name is Oliver Kiel. I'm representing the plaintiff, Coach Marcus Foreman. Just a quick question. This has nothing to do with our legal analysis test. What is the coach's record now as compared to 2005? You know? He's, I think, this season 2-1. And what was he at this point in 2005? In 2005, he had a losing season. I don't know what his record was at this point in time. Well, I see. He's trying to figure out the effect of crime. Actually, I'm glad the student initiated it. Okay. Yes. All right. It's a good question. I still hang back for the last period. Who knows? Go ahead. This wasn't a tentative lead to your Honor's questions of Mr. Katsky, and I found myself in agreement with many of the points that were raised. One of which, which I think I can't simplify, is this is an establishment cause case. It is. It is. Okay. Well, how do we understand the test for an establishment cause case? The test would be the endorsement test, and that would be whether or not a reasonable, informed observer would perceive Coach Foreman's violent gestures as being an endorsement of religion. The picture that's put forth on page 7 of the applied brief, can I assume that's an accurate portrayal of the folks taking the means? Your Honor, I don't know that you can assume that because we don't know the context in which that picture was taken. It is not part of the record below. But what we do know is that when that photograph appeared, and I think the Boston Globe, that apparently did not concern the district because they did nothing about it. In fact, when Judge Kavanaugh rendered his decision, they did not seek an injunction. They did not move for a stay. And for the entire 06 season, which, by the way, is all this case is about. This case is about the establishment clause in the 06 season. As far as 07 is concerned, I heard Mr. Katz say that everything is exactly the same. I don't know that I can represent that to the court, and certainly there's no record of that. Now, if we look at the reasonable observer, look through the reasonable observer's eyes. To what extent do we have to look at the situation through the context of history and past fragments? I think history and past practice is relevant. I think the history and past practice here supports the conclusion that there was no endorsement of religion because I don't fully understand that. You've got a history where the coach is bringing ministers in to lead prayer. Once or twice, a rabbi came into prayer. Once or twice, he would lead prayer. Prayers would be appointed to lead prayer, not a playing around of organized kneeling or bowing their head and praying. Hardcore prayer, no doubt about that. That's correct. Are you saying that the history helps you? The fact that there's a 23-year history of prayer helps you? Yes. Yes, Your Honor. I can explain why I think that's the case. The reason I think that's the case is because while that was what went on up until October of 05, and even though this predated Coach Borden's tenure as a public high school, on October 17, 2005, that stopped. It ended. When did it end? The legalities that Your Honor just described. There were no ministers. There were no rabbis brought in. There was no initiation of prayer. There was no schematic prayer activity. On October 17, 2005, Coach Borden, for the remainder of the O5 season, stood at attention to keep close, as if he were in shackles, when the students initiated prayer. That spelled out, Your Honor, in the Nixon declaration. He said that during the O5 season, because Randall Nixon was on the team in 05 and 06, he said that during the O5 season, it was awkward to watch Coach Borden. So then why are we here? I assume we're here now because the coach is doing something that can depict you a little bit. Let's say it was a prank. They took a vote and said they wanted to continue the practice of praying, and the coach was intending, awkwardly to use her phrase, taking a knee and bowing his head in some fairly physical proximity, close proximity, to where the players are praying. Is that fair? Well, no, Your Honor, it isn't in this sense, because I don't know why we're here now. The case was about the 06 season. We made a motion to dismiss, on the basis of a suggestion of movements, the county of Morris case dealing with repetitive parades, says that when the parade is over, it's over. When the silent gestures are over, it's over. This case is over because the district, when Judge Kavanaugh rendered his decision, issued a press release saying, we're pleased with the outcome, and for the entire 06 season, Coach Borden publicly and openly did what Judge Kavanaugh permitted him to do. And there was never an application for a stay, never an application for an injunction, as a result of the inaction by the district, which, by the way, calls into question this whole argument about concerns for student welcomeness and government entanglement. They did nothing, and allowed the case to lapse. And consequently, I think that the case is probably, there is no longer a case like this. That case, Your Honor, is distinguishable on the basis that there was a remaining vestige of adversity between the plaintiff in that case and the defendant. Here, there's no adversity. Borden is not charged with anything. There's nothing pending against him. If the district thinks that what he's doing in 07 is violating some policy that they may have, then as candidate Morris says, the proper procedure is to burn the case again. We've just been told that the only reason that what he's doing is he's being insubordinate. So if we were to agree with you that this case only deals with the 2006 season, then there is no case of controversy now in 2007, given the decision of the team that it wants to play and his renewal, I suppose. Then they could try to, and they can't terminate him from being a Spanish teacher, but they could take action against him, in spite of the fact, they said, at the district court, with reference to the 2006 season, that he can violently take the case. I think that they could try to do that, and then we would have our legal rights and remedies available to us. I'm sorry, you started all over again. We could start all over again, and frankly, on the second go around, all we have to do is... Are we capable of repetition yet of any review? Certainly. Certainly repetition. It is repetition, but it does not evade review. That was the point of the Kennedy and Morris case. It's about to evade review. It's about to evade review. Well, no. The 2006 case will evade review because they did nothing to preserve it. The 2007 case, well, the 2008 case hasn't been brought. The 2008 case hasn't been brought. That's up to them. That's how the case doesn't get reviewed. Well, if they choose not to burn the case, then it doesn't get unreviewed because it was unreviewable like it would be in a motion case, for example. It gets unreviewed because the district made its own choice and elected not to run an election. So let's assume, theoretically, for the sake of argument, there are some lawsuits for whom I meant to argue and I will argue, just so we can show them how we argue. It's like the modified Founding Bureau of Arguments. Let's assume for the sake of argument that we disagreed with the district court, that we thought the district court's decision was wrong, to put it mildly. You're saying, well, that's just kind of tough luck because that only dealt with what was in the past and they haven't brought a new action for 2006. So if the district court's decision is wrong, the policy still stands. The school district has said, you know, whatever you decide to do is fine and we just kind of continue down that road. I'm not saying that's too bad. The Constitution says that's too bad. Well, it's not that it's capable of repetition. It is capable of repetition. Certainly, I would agree with you, it's capable of repetition. The point of the matter is, and this point was made in the Calumny-Morris case, that the evading review presupposes that because of the nature of what it is that's in dispute, that it will never be capable of being reviewed. You brought the case, you brought the last case. I guess if they were to take action against your client, you would bring the next one. I think I probably would. Or your Honor, somebody else might. I mean, I would think your client feels a lot more comfortable out there with Judge Kavanaugh's decision. Absolutely, and that's the reason we brought the case and that's the reason the district was able to resolve it. So you'd like us to dismiss this appeal as being moot. What if we vacated Judge Kavanaugh's decision and dismissed the appeal? That is one option I would be available to you. Where would you be then? I would be in the same position I was before I filed the 06 case. Exactly, but you wouldn't be in the same position you are today. That is true, I would not be in the same position, but I think under the case law in this area, you would have the discretion in disposing of this appeal. Either to dispose of it by dismissing it or to dispose of it by vacating the judgment block. I have to confess to you that the cases I've read on it go both ways on this issue. From my perspective, it does seem to me that the district allowed this case to proceed as it may have proceeded, and at this point in time, there really is nothing before the court. Getting to the issue of Lickering and Connick and Dorsetti, none of that was raised in the district court. When I got their brief, I looked to see where in the record they said these points were raised. Because you know, I've been in this case for two years. I know what's in the record. In formula 55 and formula 86 of their reply brief, they referred to a reply brief that was filed in the district court supposedly supporting the premise that they raised Pickering, but this model Pickering, and that they raised the legitimate pedagogical reasons dealing with students feeling unwelcome and parental control. It isn't there. It's on pages 44, I think, to 57. If you read those 13 pages, and if you come away with the conclusion that that was enough to alert Judge Kavanaugh that he had to decide those issues, it isn't. But I see. Tag point to page 52 of their reply brief and summary judgment. So long as plaintiff does not take any patently obvious actions to manifest solidarity and approval with student prayer, there will be no constitutional issues. This is what Judge Kavanaugh was presenting. Exactly, and there's nothing for your honesty to reveal on that issue. Maybe it's my roots as a district court judge. It seems that the district court was trying to work things, trying to work together, trying to work this out. And the enmity that has been the hardness of it, the mean-spiritedness of some of the blue brief, for example, has just very much concerned me. It seems so long and so unnecessary here. I feel the same way about that. The students shouldn't have to be at each other's throats. Teachers and students shouldn't have to be afraid like this. But part of that argument is the teachers, the students, are at one another's throats in part because of this prayer, which is offensive to a certain population of cheerleaders and students. I don't feel compelled to say that the students are at each other's throats, except there's nothing in the record to show that. Nothing. Magistro, is that the name? Magistro? She testified to that. You're clearly not, I hope, saying that it will let the students come forward. And you were not here saying it. She was backing off of the assurance. I read that in your brief and I was struck by that. You really don't want to put the students in position, either the football team or the cheerleader squad or wherever, where they have to come forward and publicly identify. I hope so. No, Your Honor, but what's not, and frankly, Judge, what I did before the case went to Judge Kavanaugh is I stipulated that you don't have to disclose who the anonymous parents and anonymous students are. I wasn't looking for that. We're not looking, as Judge Barry correctly pointed out, we're not looking to make life difficult for the students. But at the same time, we're not looking to make life difficult for a reasonable football coach. Here in that, I do think there's a heck of a lot more going on here, and some, if not all of it, is probably driven by, in terms of the procedural posture, probably a direct correlation of local school board politics and whether or not you take a certain litigation stance. But all that aside, what really struck me is difficult, and that is, and we wrote about it in Black, White, Pride, and League, talks about that, the position the student is put in is either an unbeliever or who believes something different. There's a team member there who hears a prayer about Jesus and is infinitely uncomfortable with that and wants to get out of there because he doesn't want his presence in that posture to be interpreted as accepting all that goes with believing in Jesus. He's in an impossible situation. And the coach's response, he's coaching all the players, and he's a teacher of all the kids in that school. His response is, go in the men's room. Now, think about that. How can you honor that? And that, I won't dispute. There is absolutely no evidence in the record to support that. That's hearsay. It was never for the truth of the matter asserted. There was never any testimony from any person suggesting that Coach Borman told anybody to go into the bedroom. In fact, when October rolled around and the school board said, stop what you're doing, he stopped. And for the entire balance of the 05 season, he stood there as if he wore a governmental straitjacket because he wasn't allowed to move a muscle because if he did, he might be deemed insubordinate. And in regard to the students, you know, the certification or the declaration of Rambo Nixon I think is important. Rambo Nixon mentions in his certification that he prepared voluntarily and that, in fact, his father was an attorney. And he went over his declaration with his father before he signed it. And this is what Rambo said about what he did when Coach Borman and Margaret Quest inquired whether or not they intend to say student-initiated prayers during the 06 season. He said, all the team members told us that they wanted to say pre-game prayers during the upcoming season, as has been the East Brunswick football tradition for many years. There's not a word of complaint from a parent, from a football player, from a student, from a teacher, from an expert on religious practices, nothing. You talk about shifting burdens of production here. Where did they satisfy their burden of production of producing Calvary evidence to show that when Borman said, when I bow my head and take a knee, I am saying to my students, I respect what you are doing, but I am not praying. Even if he's not praying, from the Regional Observer, here's the New York Times headline, Coach is allowed to pray with the team. If you look at that picture, there's no way in the world a Regional Observer could look at this picture knowing nothing about this case. If I were to show them that picture, and I'm not saying it fairly represents, but if it's close, if I were to ask anybody from the age of four on up, look at that picture, what is the guy in the green shirt doing? The person is going to say, well, I know, he's praying, looks like the team is praying, and they're praying together. The Regional Observer has got to conclude that the coach is praying. He may not be praying, but the Regional Observer does. The Regional Observer of the Mesoamerican might conclude that. That's not the Regional Observer. No, the Regional Observer here knows about 23 years of history, where ministers have been brought in to lead prayer, where the coaches led prayer. And he also knows that in all five, Coach Borman stopped. He also knows that in all five, Coach Borman sued the district. He knows that in all five, the district said that Coach Borman, his silent gestures are something that we condemn. In fact, the thing that I can't understand, never could about this case, is why there was no disclaimer. If you want to avoid a misperception about an ambiguous silent gesture or an ambiguous sentence, that's why I talked to you earlier about this. I apologize. I didn't want to answer that question. Well, you know, Judge, you're right. But what you're saying, I mean, you're disenforcing your argument. Mr. Ritchie, let me ask you. You said initially that this is an Establishment Clause case. Yeah. If it's an Establishment Clause case, those are your words, how do you get around the decision in Santa Fe? Well, Santa Fe was a situation in which they specifically said that religion in schools can be permitted. The Santa Fe decision dealt with school-sponsored, it was school-government-sponsored initiation of prayer. This is student-initiated prayer. It's voluntary. It's non-denominational. It emanates from the students. It doesn't emanate from the school. In fact, just the opposite. The school was saying, we don't want to have any prayer in our school. But the school said that the students could pray. I do have an issue with whether this is truly student-initiated prayer when folks tell the captain, call the kids and see if they're not willing to pray. And if I'm on that team and put myself in the shoes of somebody who's on that team, I'm not so sure I'm going to say, hmm, no, no, I don't want to pray. But even if I did, that is not the case. The court has said it many times. We've said it. You can't subject that to the majority vote. It doesn't work that way. And it wasn't subjected to a majority vote at the behest of government. It was subjected to a vote at the behest of the captains of the team in order to determine whether or not to take the vote. So it wasn't the captains. The captains of the team were not instructed by the coach to call the team and find out whether or not they wanted to continue the tradition. Whether or not they wanted to continue what had been going on in the past. And then he said, whatever you decide to do. That's right. But the coach told them, go call the team and see whether or not they want to continue the tradition. We needed to find out whether there was a case to present the judge to have it on. To me, that's different from the students on their own deciding they want to pray outside of the locker room, not in the coach's room. But we don't have to do all this. Maybe over a cup of coffee. These issues really are not in the case. They're not in the case. You say policy. Do you believe he struck down the whole policy? No. I thought that your explanation of what was struck down was exactly what happened. So you say that the policy is vague and overbroad. Participation, quote, unquote, is a vague term. Witness some of my questions about how far can you bow your head before you're bowing. What if you're silently praying, but you say, what is participation? It's easy at the edges to define what is and what is not. It is hard to define it in the middle. If we inserted, if we, the school district, inserted the word active participation, would that make it less vague for you? It might because that differentiation, how would that help? Because it seems to me the questions that Judge Murray asked before would be as applicable if you modify it with active. It is an attempt to come back to what the reasonable observer would conclude and doesn't that get around? I don't know how you can make it less ambiguous. There's got to be some ambiguity because you can't catalog every single bodily configuration that might amount to participation in the prayer. Judge, I agree with you, except I will say that in some of the cases from the Supreme Court, mergings being one of them, in the U.S. DOE guidance, which the East Brooklyn School Board swore to follow, that phrase active participation appears. So somebody thinks there's a difference. And Judge shows in the concurring opinion in the Fifth Circuit case, used the phrase active participation, and then she used as an example holding hands in a prayer circle. Correct. You know, so that, that we would know is active participation. Well, we're taking a knee and bowing one's head in a prayer circle, being active. In a prayer circle where hands are joined? No, no, no, no, no hands. I guess she defined prayer circle, which gets to your point. In a circle, substantially equivalent to what I see on page 705 of your brief. That's not even a circle. That's kind of a... Well, they're facing the chalkboard, Your Honor. If you look closely at that picture, you'll see on the chalkboard there's some writing. No, there's nothing on the chalkboard. No, I think there is. Maybe they got caught up in the agreement. Maybe they were secretly sitting down with the guy playing the agreement. But they're facing the chalkboard. I'm speculating, but I think what happened is he finished doing a pregame strategy, worked on the chalkboard like he usually does, and he continued on with the same pregame prayer in the locker like they usually do, and he did what Judge Canova said he could do, take a knee. Was my recollection of the record correct that for 2006, he gets down on his knees to do the tactical discussion? I believe he's on his knees. He's on his knees. Yes. He goes down at the beginning now. I believe that's the difference. The team goes down with the team. They all go down together. I think so. No. I think so. But, unfortunately, we don't have a record on this because it was a dichotomy of judgment action and it was dealing with what was going to happen in the future. So we really don't know exactly what happened in those states except for one thing. The school board and the district had no complaint about it and never sought to come to this court to stop it, and yet they come into this court and they talk about Gordon being such a bad guy, Gordon manipulating his students, political control being invaded, entanglement of government and religion, and for 20 separate silent gestures, which they knew about, David will lift a finger. Now, if that doesn't tell you something about the legitimacy of the pedagogical reasons, nothing will. And I would also add, Your Honor, that if you want to know what this case is about, it's right in Dr. Magistro's very first memo to Marcus Boyle on October 7, 2005. It's in the general appendix at page 218, and she says the following, as we've discussed, this is not a matter of our personal feelings on this issue, but rather a legal matter, which we must address to protect the school district from potential litigation. That's not a pedagogical reason. She's worried about getting sued. That is not a pedagogical reason. That's a legal judgment. So what was done? Gordon filed a declaratory judgment action to resolve the legal matter. It got resolved and went to the school district on the next day. They issued a press release saying, we're pleased with the outcome. What happened between then and the time the appeal was filed, I don't know, except in the lawyers in the case. That I do know. My red light is up. Okay. Unless you want me to have to refer to questions. I don't know. What we have here is not, what appears on his face to be a pretty momentous First Amendment case. I think it's probably not a momentous First Amendment case at all. Again, personally, it's in local politics. And that was the benefit of an appellate procedure case, where he got to do that. Yeah. Is that procedure or advocacy? Advocacy. Okay. Okay. Thank you. Thank you, Judge. I'd like to say a couple of words about making a skip, if I might. Well, you know, we can keep hitting the subtleties of Lemon and Lee and Garcetti and Pickering and Connick and probably not resolving things. But what maybe we should do is have you talk to your client and try to figure out what to do about this litigation. Because the posture of this thing is almost impossible to get a handle around and to resolve this with the kind of dignity that these issues resolve and the kind of solemnity that these issues deserve. In this kind of a posture, there's always an impossibility to do that. Because he's right. The suit was brought for the 2005 season. The client comes out after losing the case and saying we're pleased with the result. And the appeal was brought, speaking only for myself and the non-compliance case, seems to me there are pretty severe and serious problems with the district court's ruling. But I'm not sure that we're going to be able to, even if I have a second voter, and that may or may not, I'm not sure if we're going to be able to get to those. And if we do, so what? We've got a judgment that then pronounces something about a bundle of rights. And I'm not even sure what's in that bundle because of the procedural posture that both sides have taken. But whatever's in there, it only pertains to the 2005 season. 2006. The 2006 season. I think it does just pertain to 2005. It does pertain to a couple of reasons, Your Honor. Number one, the conduct is continuing. It's an ongoing violation. It is something that ended. Number two is that the policy is unenforced. Well, it can continue because you've got a court order now saying that it's fine, it can continue. Why wouldn't it continue? You've got a district court judge who said that he can do what he wanted to do. You've got a court that says that, well, she's determined to do that. Number one, Judge Fischer brought up Mr. Berry's case. It's ongoing injury for the district. There's a cloud over this policy. Whether or not Judge Berry is correct or this is related to these particular actions, those are taken out of the policy. Well, what's the injury? Your client has acceded in practice to what the district court declared. Your Honor, only for the sake of obeying the judgment while appealing, which is a commonplace, right? The default is if you get a judgment against you in the district court, you obey until the court has appealed. It wasn't just for the 2000 season. Correct. So if we were to affirm, then he would be bound, the judgment would bind you in futuro. The way that I read it, Your Honor, it would bind you in the future and with respect to everybody else. Everybody else is different. Establishment clause cases are very fact-sensitive. This particular case, following you in turning the court, if it's not just for the 2006 season and we affirm, then barring some change of circumstances, this ruling will be dispositive of the 2007 season, 2008, 2009, et cetera. Correct? Yes, but dispositive in a particular way in that it would prevent the district from stopping Gordon's conduct. It would not prevent a student or a parent from suing because Gordon's conduct is attributed as a matter of law to the school district. The school district is responsible for what he does. Whether he's allowed to do it because the court has said so or otherwise, the school district is on the hook for the fact that what we have is an ongoing violation here that now the school district can be sued and can hold liable for Gordon's conduct even though they don't approve of that conduct. But the district court authorized him. He's a promoter. He's a court order. Yes, the purpose of the declaratory judgment. How could he be sued? How could he be sued for doing what a court has ordered that he be permitted to do? The declaratory judgment is between the district's enforcement of policy. It is not with respect to a student being able to say, look, this practice is coercing me to engage in prayer. It's a different book. Yes, Your Honor, but the school district would not be empowered to do anything to stop it because the only action it can take is to stop Gordon doing what he's doing. Now, he has to tell that because it has not done that. He continued doing what he was doing, and the school district hasn't done anything about it. This year, the 2006 litigation is on. 2007 season comes. We've got a declaration regarding the 2006 season. Currently, he's doing the same thing since 2007, and the school district hasn't pronounced that they're unpleased with having lost the lawsuit. It's not doing anything to stop him from doing that in 2007. Can I ask you something about the coming pleas? What actually went on there is it was simply a public information officer trying to put the best face on a bad judgment before the school did. This is a matter of local politics, Your Honor. It's not public information. Before the school board got a chance to look and see what actually went on, we have a problem here. The district, the superintendent, the board were not satisfied with this decision because it tied the hand of the district in ways that aren't necessary. Did you hear those quotations, quotes from the superintendent of the schools that I read in earlier? From testimony saying, you know, we're satisfied with this. We have no problem with this. Your Honor, again, the way that I read that... You can't make up the record. No, I'm not trying to, Your Honor. The way that I read that is the superintendent saying, if it's a judgment that he can do this, then he can do this. But that doesn't mean that he can do that. Absolutely, that's what she said. That means we adhere to the judgment unless the court reverses it. But it doesn't mean that there's not a problem with Borden's comment. It means that the district court has told the district it can't do anything about it. That's an entirely different issue. Now, the school district is still on the court. No, essentially the district court said there is no problem with the conduct that he proposed to this 2006 decision. The district did as wrong as a matter of law. How do you say the district court was right? Well, Your Honor... Are you still going to say that the conduct was wrong? Your Honor, what we will do is we'll face a suit by parents who will say what you, the school district, are doing is unconstitutional, and we'll try to defend by saying we have the district court judgment, and I think the answer is too bad. The school's conduct is what matters, and I think that parents... What I would just not mean to predict the outcome of that lawsuit if they say that the decision of the Court of Appeals for the Third Circuit is unconstitutional and you should pay damages. I think you might win that case. It wouldn't have to be that, Your Honor. I mean, it, of course, depends on how the court decided the case and a bunch of other things that go into that. But ultimately, what we have here is, because of the district court's judgment, the policy is out there. It can't be enforced, and that means that the district is under an ongoing disability. It can't stop a practice that it thinks is a problem, and it can think is a problem for all sorts of reasons. You mentioned earlier that Judge Kavanaugh did not void the policy. He certainly, at minimum, rendered it unenforceable with respect to Marcus Borden. And I don't think that there's any way to read it as anything different from that. And, of course, what prompted the policy was recognizing that they had a problem in their locker room. So your hands aren't tied with reference to other people who come in and lead religious demonstrations, faculty members who lead religious demonstrations, and things of that nature. If another teacher or another coach or another member of the, another district employee makes a similar claim, I want to be able to do X, but I'm prohibited by the policy or by a directive of the district and goes into court, is it reasonable to think that that person can't, for instance, continue to get damages? You already have a judgment against you that this is unconstitutional. What you're doing is unconstitutional over here, so it must still be here. There's a cloud over the policy. I was very concerned about a student who cheated to the coach's affairs knowledge and has not come from him but from somewhere else. Where did this allegation that I didn't tell you on the team, where did that come from? Did that get in a deposition somewhere? What there is, is there's a magistrate deposition. What the superintendent explains is that she had a parent complaint that was, I believe, confirmed by the principal who talked to Gordon, and that's where that came from. But in the end, what matters is how students perceive what Gordon, how reasonable students would perceive what Gordon is doing. And it seems clear that a reasonable student knowing the history would have to think that Gordon is doing something here that is more than just a secular sign of respect. And it's certainly something that the school district has the right to regulate and it's not prohibited from regulating. Again, had this case been presented to us in terms of deciding Pickering, then you can get a handle on the First Amendment. If you're trying to get a handle on the First Amendment, you've got to grab a handful of smoke. There's no question that at least Pickering Step 2 was raised and a fairly extended treatment explaining the balancing, bringing in the cases, explaining the very case. I don't think they're balancing under Garcetti. Of course, we started out with Garcetti. I don't know. If the coach is doing something that's part of his official duties, and it seems clear that he is, he's instructing but he's not teaching Spanish, he's instructing in the form of a coach in the football team, then under Garcetti, and in your brief, you're talking about the typical, it's always played around about the school, that the Constitution doesn't stop at the schoolhouse door, but hopefully it does at some point stop under Garcetti. But you're kind of conceding that by saying you get into the Pickering balance, and I'm not all sure you get into the Pickering balance here. I think that's right, Your Honor, and I don't think that the court needs to be troubled by the fact it can do it in Step 1 because it's had by the court that it considered quite legal questions of antecedent to an ultimately dispositive on the issue of void, and everything is precisely that with Step 1 of Pickering. The parties had all been arguing, including at the appellate level, about precisely how the standard for the balancing was carried out, whether there was a reasonable, whether the statement of the reasonable relationship test in Step 2 was correct, and this court said, we don't need to deal with that because there's a threshold legal issue here, which is that he simply doesn't have the rights that he claims Bradley can afford. I'm going to say your argument, Your Honor, we have a rule and there's a requirement in the Federal Appellate Procedure about the length of briefs, and unfortunately, for whatever reason, in their infallibilism, the Civil Rules Committee has seen, the Appellate Committee, has seen that to do away with the rule we used to have, which said the briefs shall be limited to 50 pages. That was really easy then. You go to the end of the brief, and I know that my jurist colleague to my right is not real good at math, but even she would know. You have to be here this morning. Yes, yes, I do. The number on the bottom of the page, more than 50, that brief was a non-conforming brief, and different of my colleagues did it in different ways. Doing that, one colleague would just say, stop at 50, other colleagues would send it back and say, do it over again. And I was going to have that in my dream because of the miracles of fog and space and everything. I don't know who approved this over-length brief, but as I was reading this thing, all I could think of is, you could probably take this brief and it's, what, 70 pages? And you could do it in 20 pages, with the amount of repetition and everything else, which is not all that bad. But, you know, a lot of the personal attacks, this is not the World Wrestling Federation, the personal attacks on the other side are absolutely unnecessary. It takes away from your legal argument and doesn't say good things about the author of the brief or whoever's going to argue the case and therefore take down the cloak of the author of the brief. And this is just a reference. You don't need to get down on the ground and start throwing garbage at somebody. All you have to do is give us the legal argument. That's all we want to hear. It's not injury. We're not going to be persuaded. We're not going to be persuaded by that. The court has just now described that as my fault, not the client's fault. I didn't think that we had done that, but it's the court's judgment that matters. I hear that now. It was not over-length, Your Honor, but the other concerns I certainly take to heart. I have a particular concern with 28J letters where cases, one case was filed in February and the other one in August, and they come in in the eve of oral argument, making it almost impossible for the other side to respond. I'm not suggesting that the timing was accidental, but we also have more than one case that we've heard today, and to have these things come in in the eve of oral comment is unfair. We just discovered the cases, Your Honor, as we were updating things in the court.  It's still not fair to the other side. As Judge Oliver said to me one time, very wise and very wise, since he said this, if he gets something and doesn't have enough time to comfortably fit it into his preparation schedule, he assumes that whichever term he sends it to him really didn't want him to read it to begin with, and so he adds that request and he tosses it out and doesn't even read it. We need time to read that. My understanding, Your Honor, all the 28J letters can also be filed after oral argument. We're glad that it didn't have a 28J letter because if it was in counsel's desk, it was a chance to respond. But, yes, I do want to welcome the thoughts from Temple Professor Rose's side. I'll be seeing, I'm not even sure when, but hopefully we didn't see anything to deter you from your legal profession anyhow. Thank you, Your Honor. It's a matter of advice and full concentration. It's a matter of advice and full concentration. It's a matter of self-determination and self-determination.